No. 13-1435

UNITED STATES COURT OF APPEALS
for the FOURTH CIRCUIT

MOSES D. FULTON

Plaintiff-Appellant

v.

DSM NUTRITIONAL PRODUCTS, LLC

Defendant -Appellee

On Appeal from the U.S. District Court for the
District of South Carolina at Florence

## BRIEF OF APPELLANT MOSES D. FULTON

Pheobe A. Clark
Wukela Law Firm
P.O. Box 13057
Florence, SC 29504
(843) 669-5634 (phone)
(843) 669-5150 (fax)

*Attorney for Appellant*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT

TABLE OF AUTHORITIES……………………………………………..i - iii

STATEMENT OF SUBJECT MATTER JURISDICTION
AND APPELLATE JURISDICTION……………………..…….…….. 1

STATEMENT OF THE ISSUES ………….………………………....1

STATEMENT OF THE CASE………………………………………… 2

STATEMENTOFTHEFACTS ……………………………………… 3

    1. Prima Facie Evidence ………………………………………….. 4

    2. Disparate Treatment …..……………………………..…… 9

    3. Pretext ...………………...……………….……………… 14

SUMMARY OF ARGUMENT……………………………………. 16

STANDARD OF REVIEW…………………………………………… 18

ARGUMENT

    ISSUE 1 …………………………………………………..……... 19

Did the District Court erroneously grant summary judgment on
Appellant's disparate treatment claim?


    ISSUE 2…………………………………………………………… 19

Did the district court err by failing to find clear error in the
Magistrate's improper weighing the evidence on
Appellant's disparate treatment claim, by improperly
weighing evidence and by failing to draw all inferences in
the light most favorable to Appellant?

        1. A *Prima Facie* Case …………….……………….…... 19

2. *Prima Facie* Case Flexibility...........................… 33

CONCLUSION .................................................... 38

REQUEST FOR ORAL ARGUMENT ................... 39

CERTIFICATE OF COMPLIANCE ........................ 40

CERTIFICATE OF FILING AND SERVICE. ........... 41

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS**

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. <u>13-1435</u>        Caption: <u>Moses D. Fulton v. DSM Nutritional Products, LLC</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Moses D. Fulton</u>
(name of party/amicus)

_____

who is            Appellant            ,makes the following disclosure:
        (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?   YES [x]NO

2.    Does party/amicus have any parent corporations?                           YES [x]NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations :

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held co ration or
      other publicly held entity?                                               YES [x]NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    YES  [x]NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)  YES  [x]NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    YES [x]NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _Shevli A Clark_    Date :    6/11/2013

Counsel for: <u>Appellant</u>

## CERTIFICATE OF SERVICE
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I certify that on    <u>June 11, 2013</u>    the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Jonathan P. Pearson
FISHER AND PHILLIPS LLP
Post Office Box 11612
South Carolina 29211
(803) 255-0000 (phone)
(803) 255-0202 (fax)

Christopher G. Mackaronis
BRICKFIELD, BURCHETTE, RITTS
& STONE, PC
1025 Thomas Jefferson Street, NW
Eighth Floor, West Tower
Washington, DC 20007
(202) 342-0800 (phone)
(202) 342-0807 (fax)

Signature: _Shevli A Clark_    Date :    6/11/2013

07/19/2012
sec

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Aka v. Wash. Hosp.Ctr.,*
    156 F.3d 1284, 1291 (D.C. Cir. 1998)............    31,32

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 255 (1986) ..........................    19

*Ballinger v. North Carolina Agricultural Extension Service,*
    815 F.2d 1001, 1005 (4th Cir. 1987) ..............    21

*Brinkley v. Harbour Recreation Club,*
    180 F.3d 598, 611 (4th Cir. 1999) ...................    34

*Carson v. Bethlehem Steel Corp.,*
    82 F.3d 157,158 (7th Cir. 1996) ...……............ 16,30,
                                                                          32

*Diamond v. Colonial Life and Accident Ins. Co.,*
    416 F.3d 310 (4th Cir. 2005) .........….........    21

*Hill v. Lockheed Martin Logistics Mgmt., Inc.,*
    354 F.3d 277, 286 (4th Cir. 2004) (en banc) .........    16,20

*Holland v. Washington Homes, Inc.,*
    487 F.3d 208, 213 (4th Cir. 2007) ..…….............    18

*Hoyle v. Freightliner, LLC,*
    2011 U.S. App. LEXIS 6628 (4th Cir. Apr. 1,
    2011)*(citing Gray v. Spillman,*925 F.2d 90, 95 (4th
    Cir. 1991) ......................…...............    27

*Hughes v. Bedsole,*
    48 F.3d 1376, 138e (4th Cir.), cert. denied,
    116 S. Ct. 190 (1995)..............….............    5

i

*Lightner*
   *545 F.3d at 265*..................................................     10,25

*Marlow v. Chesterfield County Sehl Bd.,*
   749 F. Supp. 2d 417,437(citing *Ballinger,*
   815 F.2d at 1005) ..........................................     22

*Marlow v. Chesterfield County Sehl Bd.,*
   749 F. Supp. 2d 417,431.(citing *Reeves,*
   530 U.S. at 153) .........................................     22,27,28

*McDonnell Douglas Corp. v. Green,*
   411 U.S. 792, 802 n.13 (1973) ................     15,26,28
                                                 34,36,37

*Merritt v. Old Dominion Freight Line, Inc.,*
   601F.3d289, 295 (4th Cir. 2010) ................     19

*Miles v. Dell, Inc.,* 429 F.3d 480, 485 (4th Cir. 2006)
   *(quoting Hill v. Lockheed Martin Logistics Mgmt.,*
   354 F.3d 277, 285 (4th Cir. 2004) (en bane)). ......     20

*Moore v. City of Charlotte,*
   754 F.2d 1100, 1107 (4th Cir. 1985) ...........     26,27,34

*O'Connor v. Consolidated Coin Caterers Corp.,*
   56 F.3d 542, 547 (4th Cir. 1995) ...................     23

*Pivirotto v. Innovative Systems, Inc.,*
   191 F.3d 344 (3d Cir. Pa. 1999) ....................     36

*Reeves v. Sanderson Plumbing Prods., Inc.,*
   530 U.S. 133, 150, 120 S. Ct. 2097,147 L.
   Ed. 2d 105 (2000) ......................................     27,31

*Sears,* 243 F.3d at 857
   *(citing Reeves v. Sanderson Plumbing Prods., Inc.,*
   530 U.S. 133, 150, 120 S. Ct. 2097,2108,
   147 L. Ed. 2d 105 (2000) ...........................     33

*Warch v. Ohio Cas. Ins. Co.,*
   435 F.3d 510, (4th Cir. 2006) .............     22,23,34

*Williams* v. *Trader Publishing Co.,*
        218 F.3d 481, 485 (5th Cir. 2000) ……………..…….…... 35


**Statutes**

Title VII, 42 U.S.C. § 2000e et seq………………….…..……... 1,2

28 U.S.C. § 1331 ……………..…….:……….……..………..... 1

28 U.S.C. § 1291 ..………...………….....………………….… 1


**Rules**

Fed. R. Civ. P. 56(c)...... …....…….….…….…………….….. 18,19

## STATEMENT OF SUBJECT MATTER JURISDICTION AND APPELLATE JURISDICTION

The Appellant brought suit against his former employer for allegedly engaging in race-discriminatory conduct and for wrongful termination, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Subject matter jurisdiction was conferred on the district court by 28 U.S.C. § 1331. Appellate jurisdiction is conferred on this Court by 28 U.S.C. § 1291, this being an appeal from a final judgment of the district court dated March 4, 2013, adopting the Report and Recommendation of the Magistrate and entering summary judgment in favor of Defendant, formerly known as Martek Biosciences Kingstree Corporation, and now known as DSM Nutritional Products, LLC.

## STATEMENT OF ISSUES

1. Did the District Court erroneously grant summary judgment on Appellant's disparate treatment claim?

2. Did the District Court err by failing to find clear error in the Magistrate's improper weighing the evidence on Appellant's Disparate treatment claim, by improperly weighing evidence and by failing to draw all inferences in the light most favorable to Appellant?

1

## STATEMENT OF THE CASE

This is an appeal from the district court upon the granting of a Motion for Summary Judgment in a case brought pursuant to Title VII of the Civil Rights Act of 1964, hereinafter, "Title VII," 42 U.S.C. § 2000e et seq. The Appellant, a former employee of the Appellee employer, filed suit on November 29, 2011 in the United States District Court, District of South Carolina, Florence Division.   (Joint Appendix, hereinafter, "J.A.," 2). The Appellant alleged that the Appellee had engaged in discriminatory conduct and that the Appellant had been wrongfully terminated.

After the discovery period had concluded, the Appellee filed a Motion for Summary Judgment on August 27, 2012, with a memorandum in support and exhibits. (J.A. 4, Doc. #20).  On September 13, 2012, Appellant thereafter filed a brief in opposition of the Appellee's motion with exhibits. (J.A. 4, Doc. #23-24). On September 14, 2012, the Appellee filed a Reply Brief to Appellant's Brief in Opposition. (J.A. 4, Doc. #25).  On January 18, 2013, the Magistrate issued a Report and Recommendation recommending that Defendant's Motion for Summary Judgment be granted and the case be dismissed, finding Appellant failed to meet his burden of creating a genuine dispute of material fact as to whether termination was based upon his race. (J.A. 167-175).

On March 4, 2013, the district court entered an Opinion and Final Order in the matter overruling all of Appellant's objections, adopting the report and recommendation of the Magistrate, granting summary judgment to the Appellee and dismissing Appellant's case. (J.A. 184). The district court opined that the Appellant had failed to show satisfactory job performance; and Appellant failed to present sufficient evidence to show that other employees were similarly situated in "all relevant respects" to satisfy the fourth element of the *prima facie* standard; and with respect to pretext, the district court agreed with the Magistrate's finding that Appellant failed to meet his burden of creating a genuine dispute of material fact as to whether his termination was based upon race. (J.A. 175, 179-183).

The Appellant timely filed his Notice of Appeal on April 3, 2013, in the district court, and fulfilled all subsequent filing requirements including the filing of this brief and the contemporaneously filed Joint Appendix. (J.A. 186).

## STATEMENT OF THE FACTS

Appellant, a black male, had been employed with Appellee, Martek Biosciences Kingstree Corporation ("Martek") from December 27, 2004, until January 20, 2010. Over the course of Plaintiff's employment, he experienced racial discrimination with respect to performance evaluation, promotion and discipline.

3

Plaintiff was not on probation for non-conformances at the time of his termination in 2010; and Defendant never issued Plaintiff an "Employee Corrective Action Notice" for non-conformances before his termination on January 20, 2010. Plaintiff was terminated on January 20, 2010, and Defendant's termination reason was "excessive non-conformance errors". However, Brian Lee, the human resources representative who had made the decision to terminate Appellant, admits repeatedly that he has to "rely on management to perform their job in a consistent manner" (Exhibit D Brian Lee Deposition p. 171), that with respect to the 80 – something non conformities "No I did not see an explanation behind each one" (Exhibit D Brian Lee Deposition p. 173), with respect to his alleged 16 non conformances and whether he saw proof "I did not." (Exhibit D Brian Lee Deposition p. 184).

### 1.    Prima Facie Evidence

To establish a prima facie case that Appellant, Moses Fulton, was fired because of his race, he had to set forth specific facts showing that: "(1) he is a member of a protected class; (2) he was qualified for his job and his job performance was satisfactory;  (3) he was fired; and, (4) other employees who are not members of the protected class were retained under apparently similar

4

circumstances." *Hughes* v. *Bedsole,* 48 F.3d 1376, 138e (4th Cir.), cert. denied, 116 S. Ct. 190 (1995).

Appellant, an African American male, was terminated on January 20, 2010, and Martek's termination reason was "excessive non-conformance errors". Appellant had never received any prior "Employee Corrective Action Notice" for non-conformance errors and had never been placed on suspension before termination. The previous infractions listed on his termination notice included 4 written warnings and 2 probationary periods for attendance and 1 warning for failure to follow procedures. (J.A. 125). As the Magistrate acknowledged in its Report and Recommendation, "It is undisputed that [Appellant] is a member of a protected class and that he suffered an adverse employment action when he was terminated." (J.A. 169). At issue are the two remaining elements of the claim: (a) satisfactory performance; and, (b) comparator employees engaged in similar conduct.

**a)     Satisfactory Performance**

It cannot be disputed that Plaintiff was on no performance improvement plan at that time and he was under no direct threat of termination for work performance. Before the January 20, 2010, termination, Plaintiff was under a

probationary period (which was to last from 9/21/2009 to 3/12/2010) for alleged Attendance violations. (J.A. 122-123). Plaintiff, had not accumulated any further attendance violations since the September 21, 2009 write up and was otherwise performing his duties and meeting his employer's expectations at the time of his termination on January 20, 2010. Although on probation, Plaintiff was not on probation nor was he under the threat of termination for non-conformance errors, which was the alleged reason for his termination. Therefore, with respect to Plaintiff's job performance, Plaintiff was performing satisfactorily.

With respect to the attendance, Appellant was performing at a level that met the employer's legitimate expectations in light of the standard regarding attendance that Appellee set for Joe Weatherford, a white male employee of Martek. Joe Weatherford was placed on a 2 month probation for the offenses of "attendance, failure to clock, performance." (J.A. 127). Appellant was placed on a 6 month probation for the sole offense of "Attendance violation." (J.A. 122). Based on Martek's high level of tolerance for non-work performance violation, to be explained below, Appellant was meeting the legitimate and established expectations in terms of attendance.

In 2006, Joe Weatherford was given a written notice and placed on probation for only 2 months for being tardy at least 50 occasions for the period of January 1, 2006 to July 31, 2006. Joe had been warned about excessive tardiness

before in December 2005. (J.A. 127). Despite "at least" (and possibly not only) 50 occasions of attendance violations, Appellant was only given a 2-month probation. Despite his excessive tardiness, Joe Weatherford continued to be employed and was given positive reviews (J.A. 129-132).

Therefore, Appellant was performing as satisfactorily as Joe Weatherford. Furthermore, Brian Lee then states "the most recent event that triggered termination was not attendance"). (J.A. 62). Prior to termination, Appellant had never been placed on probation or given employee corrective action notice for non-conformance errors; and Appellant had no attendance violations from September 21, 2009 to his termination of January 20, 2010. Before his termination, Appellant had no work related violation since August 13, 2008. (J.A. 125). Appellant had been performing his job satisfactorily, or at the very least, in viewing the evidence in a light most favorable to Appellant, had created a question of fact for a jury to determine whether or not Appellant was performing satisfactorily.

### b) Comparator Employees engaged in similar conduct

Plaintiff was terminated for "Excessive Non-Conformance Errors", considered a "Level I" offense. (J.A. 136). The HR manager never saw evidence or explanation of the Non-Conformance Errors. (J.A. 64, 65). Plaintiff never

7

received any Employee Corrective Action Notices regarding Non-Conformance

Errors that were included in the "previous Infractions section of his Termination

Notice. (J.A. 125). Brian Lee, Sr. HR manager was the person involved in Moses

Fulton's termination. (J.A. 50-51). Brian Lee stated that he felt that Plaintiff's

termination was warranted based on the "chronic performance history." (J.A. 60).

Other employees of Defendant who were Caucasian were not disciplined in the

same manner as Plaintiff. Nikki Lee, another employee of Defendant, left work

early without permission, was disruptive, insubordinate, a serious offense as stated

by Sr. HR manager Brian Lee, (J.A. 40-41) and is still employed with Defendant.

It should be noted that Ms. Lee exhibited disruptive behavior against her direct

supervisor in 2005 (two incidences) and in 2006, and she was issued a corrective

action notice in January 2007. Despite all this "chronic performance history"

which Brian Lee states caused Appellant's separation, Nikki Lee was given in May

2007 a written notice and probation for engaging in disruptive behavior twice

more in May 2007. (J.A. 139-140). It should be noted that Nikki Lee's probation

for disruptive behavior was 90 days (J.A. 139), while Weatherford's probation for

attendance, failure to clock in and performance was 2 months (J.A. 127), while

Appellant's probation for attendance was 6 months (J.A. 122).

8

This example alone creates a question of fact as to whether or not Appellant engaged in disparate discipline. But much more of the comparator evidence of unfair treatment establishes Appellee's pattern of disparate treatment.

### 2.    Disparate Treatment

Appellant was terminated for what was considered a Level I offense, non-conformance errors. (J.A. 136).  Appellee's Human Resources manager acknowledged other Level I or II infractions committed by other employees. (J.A. 13-16).  Appellee establishes with its evidence that Gerald Timmons, a white male employed in the RBD department as a team leader, could not perform as a team leader and was only demoted to Manufacturing Technician I (he was not terminated). Timmons, in the most similar position to Appellant, was given a written notice for failure to follow procedures, a verbal notice for a procedural error in January 2010 and a written notice for the same type of error in February 2010. (J.A. 20,22,24).  Despite his many errors in a leadership position, Gerald Timmons was simply demoted to a Manufacturing Technician Level III.  (J.A. 24).

Appellee establishes with its own evidence,  Matthew Evans, a white male who called a black co-worker Will Rogers a "nigger", was suspended without pay for a week (he was not terminated).  (J.A. 14-15).

Appellee establishes with its own evidence, Sparky Avant, who was working for Defendant when he was arrested for an alcohol-related offense, was suspended for a week (he was not terminated). (J.A. 15).

Appellee establishes with its own evidence, Brian Lowder, a warehouse operator, was issued a written notice for carelessness in April 2008, written warning for too many absences in May 2008 (J.A. 29), and a written notice in March 2009 for attendance (J.A. 32), (he was not terminated).

Appellee establishes with its own evidence, C.R. Altman was only demoted after he admitted sexual harassment in the workplace (he was not terminated after admitting to sexual harassment). (J.A. 16).

It is uncontradicted that all these employees, subject to the same discipline policy regardless of their job title, committed Level I and Level II offenses, and all remained employees – even the most glaring example Brian Lowder – who had attendance and error issues like Plaintiff allegedly had, and was issued warnings/notices and was not terminated.

With respect to disparate discipline, a plaintiff must show: (1) that he engaged in prohibited conduct similar to that of a person of another race, color, sex, religion, or national origin; and (2) that disciplinary measures enforced against him were more severe than those enforced against the other person. *Lightner v. City of Wilmington*, 545 F.3d 260, 264-65 (4th Cir. 2008) (*Emphasis added*).

Appellee has established with its own evidence that disciplinary measures enforced against Appellant were more severe than those enforced against other employees some within Appellant's department, such as Gerald Timmons and others similarly situated such as Bryan Lowder, and other similarly employed and subject to the same handbook as Appellant.

Appellee clearly engaged in a pattern of discrimination that affected other African American employees who also claimed to be victims of Defendant's discriminatory work environment. Veronica Smith, also filed a claim of discrimination with respect to disparate discipline and unfair treatment in terms and conditions of work (Case # 4:11-cv-03457) when she was terminated for performance despite requesting training and complaining of unfair behavior of her supervisor. Trey Cooper filed a claim of discrimination with respect to hiring, termination, and unfair treatment in terms and conditions of employment (Case # 4:11-cv-2553) when he was terminated for falsification of documents despite the fact that his supervisor continued to demand that he complete a document in which he stated he had no training to complete, when the product was not even at the facility, and when he asked for help, his co-worker told him what to write. William Rogers filed a claim of discrimination with the EEOC against Defendant for racial discrimination (EEOC # 436-2008-00174) after he had been called a nigger (J.A. 46-47).  In addition, Brian Lee testified to prior incidents of sexual harassment and

11

two claims of race discrimination involving Desmond Jackson and Jawan McCray. (J.A. 43-45). And Moses Fulton, the Plaintiff in this case, was terminated for Non-Conformance errors when he was never issued an Employee Corrective Action notice for that offense before the notice stating that he was terminated. (J.A. 125).

Further proof of disparate treatment exists in the attitude of the decision maker in Appellant's termination. The decision to terminate Appellant was ultimately reviewed and approved within the Human Resources Department as no disciplinary actions were taken "without the direct involvement of the Human Resources Department as counsel to management" (J.A. 135); and the senior HR Manager responsible for approving the employment decision, who testified that he "was involved in the process" was Brian Lee. (J.A. 50-51).

Brian Lee, HR Manager, recounted many disciplinary matters that he had knowledge of and some rationales behind his decision. Brian Lee, HR Manager, testified that when a Caucasian employee was accused of sexual harassment, the only action taken against him was a demotion from supervisor to operator (J.A. 43); and when one Caucasian co-worker called another African American co-worker a nigger, a comment that Brian Lee takes very seriously, that co-worker was only suspended because of lack of previous issues and because he apologized. (J.A. 46-48). Brian Lee explains that with that incident "you have to look at the

12

situation" and co-workers were in the break area "joking back and forth" and the co-worker had "apologized immensely to Mr. Rogers." (J.A. 48).

Brian Lee also demonstrates a different attitude with respect to Moses Fulton's absences and white employee Joe Weatherford's tardies. Both employees engaged in attendance violations regardless of absence or tardy. Moses Fulton had to take excessive absences due to the abrupt death of his ex-wife resulted in him having to take custody of his other two children in addition to his one year old, one of which had medical issues. Brian Lee admits to having knowledge that Moses Fulton's ex-wife was murdered (a horrific incident by any reasonable person's standard) and that Appellant was abruptly placed in a situation with two additional children. (J.A. 57-58). Despite all this knowledge, Brian Lee offered Plaintiff no alternatives to allow him to leave work. However, Brian Lee allowed Joe Weatherford (with 50 tardies in a 6 month period in 2006) to work from home because he was going through a divorce, (J.A. 58-59), and he did not appear to have a problem with him being "understandably out a bit" in 2009 because of his divorce and getting custody of his kids. (J.A. 56). Although reasonable minds would agree that bereavement for the deceased mother of Appellant's children trumps divorce, it appears that the only person in this scenario who was given any concessions, was the Caucasian employee going through a divorce.

In addition, Veronica Smith, an employee who has also filed a claim of discrimination Appellee, while working in the IT department, describes times when she was asked to investigate suspected issues with African American employees - and when it was discovered that misconduct was done by Caucasian employees, no further action was taken - and no misconduct was discovered by the African Americans that Veronica Smith was asked to investigate. (J.A. 153 - 155).

### 3. Pretext

Brian Lee stated that he felt that Plaintiff's termination was warranted based on the "chronic performance history." (Plaintiff Exhibit D Deposition of Brian Lee, p.162). However, despite the "chronic performance history" of Nikki Lee, a white female employee, Nikki Lee was given probation for disruptive behavior for 90 days (J.A. 139), while Joe Weatherford was given probation for attendance, failure to clock in and performance was 2 months (J.A. 127), while Appellant was given probation for attendance was 6 months. (J.A. 122).

Appellant was terminated for non-conformance errors without receiving employee corrective action notices for this infraction in the past. Appellee and the lower court highlighted past attendance issues as a sign of Appellant's unsatisfactory performance. Appellee establishes with its own evidence, Brian

14

Lowder, a warehouse operator, was issued a written notice for carelessness in April 2008, written warning for too many absences in May 2008 (J.A. 29) and a written notice in March 2009 for attendance (J.A. 32) (he was not terminated). Appellee also establishes with its evidence that Gerald Timmons, a white male employed in the RBD department as a team leader, could not perform as a team leader and was only demoted to Manufacturing Technician I (he was not terminated). Timmons, in the most similar position to Appellant, was given a written notice for failure to follow procedures, a verbal notice for a procedural error in January 2010 and a written notice for the same type of error in February 2010. (J.A. 20,22,24). Despite his many errors in a leadership position, Gerald Timmons was simply demoted to a Manufacturing Technician Level III. (J.A. 24).

Other African American employees also claimed to be victims of Appellee's discriminatory work environment as well; and appellant provided examples, company wide, of differing discipline and the differences in not only treatment, but also the mindset of the human resources representative are divided by race.

Proof of discriminatory intent can be inferred "*from the mere fact of differences in treatment.*" *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed. 2d 668.   Proof of pretext can be inferred from these differing attitudes as well as they raise a question as to the legitimacy of Martek's actions.

15

## SUMMARY OF ARGUMENT

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the appellant was the victim of intentional discrimination." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 286(4th Cir. 2004) (en banc). "To demonstrate such an intent to discriminate, ... an individual ...must produce sufficient evidence upon which one could find that the protected trait actually motivated the employer's decision." *Id*. The fourth circuit has noted that the appropriate inquiry in discharge cases is ***whether Appellant's discharge was more severe discipline for Appellant's misconduct than that received by the employees outside the protected class.*** *Cupples v. AmSan, LLC*, 282 Fed. Appx. 205, 209 (4th Cir. 2008). In addition, the Seventh Circuit has emphasized that the central inquiry in a discriminatory discharge case was **"whether the employer would have taken the same action had the employee been of a different race...."**. *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157,158 (7th Cir. 1996). That is the central inquiry in this case. When multiple Caucasian employees company wide engage in Level I offenses like Appellant, or even Level II offenses, which are presumably worse than Appellant's infraction, and remain employed, is there enough evidence to present a jury question of discrimination based on race when an African American employee commits a Level I offense and is terminated?

16

Rather than focus on its rigid *prima facie* analysis of the facts, the proper inquiry of the lower court should have been to analyze, whether the evidence established, when viewing the evidence in a light most favorable to Plaintiff, the employer would have taken the same action had the employee been of a different race. Evidence in this case, suggests that the human resources manager does not view policy violations of whites in the same manner as blacks. Evidence goes beyond Appellant's department – the differing treatment is company wide.

Appellant committed a Level I offense just like co-workers inside and outside of his department. The decision to terminate Appellant was ultimately reviewed and approved within the Human Resources Department as no disciplinary actions were taken "without the direct involvement of the Human Resources Department as counsel to management" (J.A. 135); and the senior HR Manager responsible for approving the employment decision, who testified that he "was involved in the process" was Brian Lee. (J.A. 50-51). Appellant has provided proof of disparate treatment with respect to comparators within Appellant's department, similarly situated employees, and employees company wide; Appellant has also provided proof of a differing attitude of the HR Manager with respect to discipline of whites vs. blacks; and Appellant has provided a number of other complaints of discrimination which at least suggest if not establish a pattern of discrimination by Martek towards its employees.

17

Despite the evidence that at the very least created a material question of fact to be weighed by a jury, the district court agreed with the recommendations of the magistrate that Appellant's case should be dismissed because Appellant failed to meet his burden of creating a genuine dispute of material fact as to whether termination as based upon race. (J.A. 167-175).

Appellant's first issue on appeal of the District Court's decision is that the lower court applied a rigid *prima facie* analysis to erroneously grant summary judgment against Appellant, thus precluding Appellant from advancing his discriminatory discharge claim based on disparate treatment.

Appellant's second issue on appeal of the District Court's decision is that both judges in the lower court improperly weighed the evidence before them rather than determine simply the existence of evidence of material fact in dispute that would allow a fact finder to make a determination of race discrimination.

## STANDARD OF REVIEW

The Court reviews the trial Court's decision on summary judgment de novo, applying the same standard as the district court. *See* Fed. R. Civ. P. 56(c); *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007). Under that standard, summary judgment is appropriate when "there is no

18

genuine issue as to any material fact." Fed. R. Civ. P. 56(c)(2); *Merritt v. Old Dominion Freight Line, Inc.,* 601 F.3d 289, 295 (4th Cir. 2010). The court must draw any permissible inference from the facts in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

## ARGUMENT

## ISSUE 1:

Did the District Court erroneously grant summary judgment on Appellant's disparate treatment claim?

## ISSUE 2:

Did the District Court err by failing to find clear error in the Magistrate's improper weighing the evidence on Appellant's disparate treatment claim, by improperly weighing evidence and by failing to draw all inferences in the light most favorable to Appellant?

### 1. A *Prima Facie* Case

Appellant's claim is one of discriminatory discharge based on race. Specifically, Appellant contends that similarly situated co-workers were not terminated for offenses in the same category code as appellant's offense.

### a. **The Magistrate recommended dismissal of Appellant's Claim**

The Magistrate determined the standard to obtain relief based upon alleged race discrimination under Title VII, a appellant must demonstrate that: (1) he is a member of the protected class; (2) he suffered an adverse employment action; (3) at the time of the adverse action, he was performing at a level that met the employer's legitimate expectations; and (4) his position remained open or was filled by a similarly qualified individual outside the protected class. *Miles v. Dell, Inc.,* 429 F.3d 480, 485 (4th Cir. 2006) *(quoting Hill v. Lockheed Martin Logistics Mgmt.,* 354 F.3d 277, 285 (4th Cir. 2004) (en banc)). (J.A. 168). The Magistrate recommended dismissal of Appellant's case upon a determination that Appellant failed to meet his burden of creating a genuine dispute of material fact as to whether his termination was based upon race. Appellant objected to the Magistrate's determinations with respect to elements of the *prima facie* claim with respect to whether or not Appellant was meeting his employer's expectations and whether Appellant's comparators were similarly situated. Appellant noted in its standard of review and argument that the court cannot make credibility determinations or weigh the evidence, but the court should examine *uncontradicted* and *unimpeached* evidence offered by the moving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

### b. **The Court adopted the recommendation of the Magistrate**

The District Court overruled Appellant's objections. In its standard of review, the lower court acknowledged, "The Court reviews only for clear error in the absence of specific objection". *See Diamond v. Colonial Life and Accident Ins. Co.*, 416 F.3d 310 (4th Cir. 2005)." (J.A. 178). The lower court determined that the Appellant had failed to show satisfactory job performance; and Appellant failed to show that other employees outside the protected class were treated differently for similar behavior; and with adopted the magistrate's finding with respect to pretext, that Appellant failed to present evidence sufficient to show that racial discrimination was a part of Appellee's normal operating procedures. (J.A. 175, 179-183).

In adopting the report and recommendation of the Magistrate, the lower court erred in adopting the improper weighing of evidence by the Magistrate without finding clear error. The lower court ultimately made decisions about the discriminatory intent demonstrated through differing treatment, first by the magistrate's determination that Appellant failed to create a genuine dispute of material fact as to whether his termination was based upon race, and then by the final order agreeing that Appellant failed to show that racial discrimination was a part of Appellee's normal operating procedures.

Summary judgment is "seldom appropriate in cases wherein particular states of mind are decisive as elements of a claim or defense." *Ballinger* v. *North*

*Carolina Agricultural Extension Service,* 815 F.2d 1001, 1005 (4th Cir. 1987) (internal citations and quotations omitted). Accordingly, "courts must take special care in [these] cases ... because motive often is the critical issue in employment discrimination cases." *Marlow* v. *Chesterfield County Sehl Bd.,* 749 F. Supp. 2d 417,437 *(citing Ballinger,* 815 F.2d at 1005).

The lower court discredited legitimate evidence proferred by Appellant in a way that allowed the lower court "impermissibly substitute its judgment concerning the weight of the evidence for the jury's." *Marlow v. Chesterfield County Sehl Bd.,* 749 F. Supp. 2d 417,431. *(citing Reeves,* 530 U.S. at 153).

### c. Appellant Meeting Expectations

A party may establish a *prima facie* case by proffering evidence that demonstrates (or at least creates a question of fact) that the employer's expectations were illegitimate. *See Warch v. Ohio Cas. Ins. Co.,* 435 F.3d 510, (4th Cir. 2006). Appellant has done that by showing that the employer allowed other employees to commit multiple policy violations, have multiple probation violations and remain employed. Appellant's termination appears to be caused by a Level I offense (poor work effort). (J.A. 136). As stated above, although on probation from 9/21/09 to 3/21/10 for attendance violations, Plaintiff, had not accumulated any further attendance violations since the 9/21/09 write up and was otherwise performing his

22

duties and meeting his employer's expectations as of his termination on 1/20/10,

which was the result of a completely different reason for which he had no corrective

action notices for at all. (J.A. 122-123).   Furthermore, Brian Lee then states "the

most recent event that triggered termination was not attendance") (J.A. 62).

Therefore, any analysis of Appellant's attendance issues are irrelevant to the

determination of whether he was performing satisfactorily at the time of termination.

*See  O'Connor v. Consolidated Coin Caterers Corp.,* 56 F.3d 542, 547 (4th Cir.

1995) (**holding that a review of an employee's 1989 performance was irrelevant**

**to a determination of whether his performance was satisfactory at the time of**

**his termination in August of 1990**), *rev'd on other grounds*, 517 U.S. 308, 116 S.

Ct. 1307, 134 L.Ed.2d 433 (1996). Therefore, Appellant's past history, especially

when he was not on probation at the time of termination, is prejudicial and irrelevant

to the fact of whether Appellant's performance was satisfactory at the time of his

termination.

　　　　As noted in *Warch v. Ohio Cas. Ins. Co.,* 435 F.3d 510, 517 (4th

Cir.Md. 2006):

> Although on summary judgment, an employer is free to assert that the
> job expectation prong has not been met, **nothing prohibits the**
> **employee from countering this assertion with evidence that**
> **demonstrates (or at least creates a question of fact) that the**
> **proffered "expectation" is not, in fact, legitimate at all.** Thus, where
> application of the qualification or expectation element of the prima facie
> case seems to preclude an otherwise meritorious claim, the appellant is

free to demonstrate that the employer's qualifications or expectations are not, in fact, "legitimate." (*emphasis added*).

Appellant has provided evidence of another employer, subject to the same attendance policy requirements, Joe Weatherford, who was given probation for attendance, failure to clock in and performance was 2 months. (J.A. 127), while Appellant was given probation for attendance was 6 months. (J.A. 122). This Caucasian employee was tardy 50 times before he even got a written notice in August 2006 for an attendance violation (J.A. 127)– while Appellant was given a first given a written notice in March 2007 for leaving work early 7 times between January and March. (J.A. 122). This at least suggests that Appellee's proffered "expectation" of perfect attendance or no attendance violations ,in not legitimate in light of the leniency shown Joe Weatherford and also Bryan Lowder  written warning for too many absences in May 2008 (J.A. 29) and a written notice in March 2009 for attendance. (J.A. 32).

### d. <u>Appellant Similar Comparators</u>

The lower court further weighed evidence when it determined that Appellant failed to show that other employees were similarly situated. The lower court determined that Appellant failed to meet the element of establishing similarly situated employees because the comparators were "similarly situated in few, if any,

relevant respects." (J.A. 171). However, these determinations were (1) clear error as they were questions of fact to be determined by a jury, and (2) based on an incorrect standard of analysis as set by the fourth circuit. Throughout its analysis of comparator employees, the lower court determines the lack of similarity because the employees were in different departments and had different supervisors. But as established above, all employees were subjected to the same attendance policy and were all required to provide error free work. These requirements do not differ based on job title. Furthermore, regardless of the supervisor, all employees were disciplined by the same HR Manager, who did more than rubber stamp decisions. He testified that he had knowledge of terminations (J.A. 50-51), provided an affidavit (J.A. 13-16) and deposition testimony discussing other employees at length (J.A. 46-57) and the policy stated that human resources was directly involved in all decisions as counsel to management (J.A. 135) –not to rubber stamp their decisions.

It was already acknowledged by the lower court that Appellant had shown other employees involved in worse acts than Appellant's Level I offense: "While [Appellant] has certainly shown that some other employees outside his protected class committed Level II violations and were not fired, '[t]he similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful' (*quoting Lightner v. City of Wilmington*, 545 F. 3d 260, 265 (4th Cir. 2008)". (J.A. 183).

25

With respect to comparator employees, The Supreme Court has made clear: "as we indicated in McDonnell Douglas, an allegation that other 'employees involved in acts against [the employer] of comparable seriousness' received more favorable treatment "is adequate to plead an inferential case" of discrimination." *McDonald v. Santa Fe Trail Transp.* Co., 427 U.S. 273, 283 (U.S. 1976), (*quoting McDonnell Douglas*, 411 U.S. at 804). Evidence has been presented that all employees were subject to the discipline of the HR Manager, and evidence has been presented that Gerald Timmons was similarly situated to Appellant and was not terminated for the same types of issues that Appellant had. Timmons, in the most similar position to Appellant, was given a written notice for failure to follow procedures, a verbal notice for a procedural error in January 2010 and a written notice for the same type of error in February 2010. (J.A. 20,22,24). Despite his many errors in a leadership position, Gerald Timmons was simply demoted to a Manufacturing Technician Level III (J.A. 24). And any argument that Gerald Timmons did not have the same number of errors as Appellant is negated by the fourth circuit's clear holding that A "principled determination of 'comparable seriousness' require[s] at least initial deference to the system of offenses created by [the employer]." *Moore V. City of Charlotte*, 754 F.2d 1100, 1108(4th Cir. 1985). This inquiry assigns to lower courts the "difficult, but not unfamiliar, task of assessing the ***gravity of the offenses*** on a ***relative scale***." Id. at 1107 (*emphasis*

26

added). *See* also Alexander v. City of Greensboro, 762 F.Supp.2d 764, 796(M.D.N.C. 2011) ([P]recise equivalence in culpability between employees is not the ultimate question: . . . an allegation that other employees involved in acts against [the employer] of comparable seriousness [were treated less severely] is adequate to plead an inferential case." (alterations in original) (citing Moore v. City of Charlotte, 754 F.2d 1100, 1107 (4th Cir. 1985)).

The Court interpreted Appellant's comparator evidence in the light most favorable to Appellee, not the Appellant, and finding those comparators were not "similarly situated" in clear violation of the summary judgment standard. *See Hoyle v. Freight liner, LLC*, 2011U.S. App. LEXIS 6628 (4th Cir. Apr. 1, 2011) (*citing Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991)), **("[t]he question at the summary judgment stage is not whether a jury is sure to find a verdict for the Appellant; the question is whether a reasonable jury could rationally so find."**).

The lower court discredited legitimate evidence proferred by Appellant that the Appellant was treated differently than those similarly situated who also committed Level I, and even Level II offenses, in a way that allowed the lower court "impermissibly substitute its judgment concelning the weight of the evidence for the jury's." *Marlow v. Chesterfield County Sehl Bd* ., 749 F. Supp. 2d 417,431. (Citing Reeves, 530 U.S. at 153).

### e. Pretext

The appropriate inquiry is whether Plaintiff's discharge was more severe discipline for her misconduct than that received by the employees outside the protected class. *Cupples v. AmSan,* LLC, 282 Fed. Appx. 205, 209 (4th Cir. 2008).

Once Appellee offers evidence to support that legitimate non- discriminatory reasons were the cause of the adverse employment action, the burden shifts back to Appellant to prove pretext. *Marlow*, 749 F. Supp. 2d at 431 (citing Reeves, 530 U.S. at 142-43). The Appellant must then carry the ultimate burden of proving intentional discrimination based on race. *Id.* (citing Reeves, 530 U.S. at 146). Such proof may be separate evidence of race animus or the resulting reasonable inference of discrimination based on evidence that the employer's explanation is false. *Id.* (citing *Reeves*, 530 U.S. at 146-147). As the Marlow court determined, the Appellant in the current action may "offer both measures of possible proof." *Id.* at 431. In the instant matter, the evidence clearly passes this scrutiny. Plaintiff has proven a difference in treatment between her and her comparators. Proof of discriminatory intent can be inferred "from the mere fact of differences in treatment." *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed. 2d 668.

Appellant provided more than that. Appellant provided differences in Appellee's human resources manager's application of Martek's policy. Appellant provided proof in the human resources manager's own testimony that he was more

understanding and made more excuses for the Caucasian employees' infractions while having a zero tolerance policy for African American employees.

Brian Lee demonstrates the different attitude toward Plaintiff's absences and Joe Weatherford's absences as well. On Plaintiff's first corrective action for absences, he writes that the passing of his ex-wife resulted in him having to take custody of his other two children in addition to his one year old, one of which has medical issues. (J.A. 115). Despite all this knowledge, Brian Lee offered Plaintiff no alternatives to allow him to leave work. However, Brian Lee allowed Joe Weatherford (with 50 tardies in a 6 month period in 2006) to work from home because he was going through a divorce (J.A. 57-59) and he did not appear to have a problem with him being "understandably out a bit" in 2009 because of his divorce and getting custody of his kids (J.A.54-56) .

To further prove, HR's discriminatory attitude toward African American Employees, Veronica Smith was asked to investigate African American employees for misconduct and when it was discovered that the Caucasian employee engaged in misconduct no further action was taken.

Based on these differing attitudes of discipline based on color, the proper question should not be whether or not Martek had found a real reason to terminate Appellant - the question should be whether Plaintiff's discharge was more severe discipline for her misconduct than that received by the employees outside the

29

protected class. *Cupples v. AmSan,* LLC, 282 Fed. Appx. 205, 209 (4th Cir. 2008). When the proper inquiry is made, the analysis of whether or not Martek's termination decision was legitimate differs as one is forced to examine whether or not the termination decision was more harsh, and therefore, less legitimate, in light of the past history of discipline for similar or more worse policy violations.

This Court has set a precedent holding "rejection of the legitimate, nondiscriminatory reason proffered by the Appellee, coupled with the elements of the prima facie case, may permit the fact-finder to infer the ultimate fact of invidious discrimination with no additional proof of discrimination." Jiminez v. Mary Washington Coll., 57 F.3d 369, 378 (4th Cir. 1995).

The Appellees have advanced and the lower court believed that Appellee had a legitimate non-discriminatory reason for terminating Appellant. However, in the discussion of pretext, this Court should ask the Seventh Circuit question "whether the employer would have taken the same action had the employee been of a different race ...." Carson v. Bethlehem Steel Corp., 82 F.3d 157,158 (7th Cir. 1996). As the seventh circuit emphasized, this should be the central inquiry in a discriminatory discharge case; and as the central inquiry, it should also be a question advanced to determine the existence of pretext.

Appellant has established that discipline has clearly differed along racial lines from the investigations being started and stopped based on race (J.A.153 - 155), and

from comparative discipline of Appellant and Gerald Timmons and the comparative

discipline of Appellant and Nikki Lee and Joe Weatherford. Regardless of being

similarly situated, the evidence of disparate treatment with respect to discipline

could create a question of fact as to whether or not Martek's terminations are

legitimate when other violations do not result in termination. Appellant established

that serious offenses are not immediately terminable as Appellee would like to

advance as other serious and serial offenders of policy remain employed.

With respect to pretext, summary judgment is warranted when "no rational

fact finder could conclude that the action was discriminatory. "*Reeves v. Sanderson

Plumbing Prods.,* 540 U.S. 133, 148 (2000). The Reeves court noted one kind of

cases in which a plaintiff might not be entitled to a jury trial despite having

introduced evidence establishing the falsity of Defendant's explanation of its actions.

This would be one in which "the plaintiff created only a weak issue of fact as to

whether the employer's reason was untrue and there was abundant and

uncontroverted, independent evidence that no discrimination had occurred." *Id .*

*(Citing Aka v. Washington Hospital Center,* 156 F.3d 1284, 1291-1292 (D.C. Cir.

1998). *Aka,* the case cited by the Supreme Court, makes clear that this category of

cases typically involves a situation where "an employer has a strong record of

equal opportunity employment" such that "any inference of discrimination arising

from the discrediting of the employer1s explanation may be a weak one, and in some

31

cases not strong enough to let a reasonable fact finder conclude that discrimination has occurred at all." *Aka v. Wash. Hosp . Ctr.,* 156 F.3d 1284, 1291 (D.C. Cir. 1998).

The record in this case falls far short of establishing that Defendant has a strong record of equal employment opportunity based on the numerous acknowledged and uncontradicted complaints of discrimination lodged against this one employer.

Despite casting doubt on the Appellee's position that Appellant's serious infraction warranted termination (that doubt being the litany of other employees who routinely violated policy and remained employed), the lower court determined that it was not clear that "racial discrimination was part of Defendant's normal operating procedures" The lower court cannot set a higher standard than what was required. Appellant advanced evidence that Appellee engaged in a pattern of practice of discrimination which should support Appellant's position that Appellee's proffered legitimate reason for terminating Appellant and not the other Caucasian employees committing Level II offenses is pretext. Appellee rests on the claim that Appellant violated the rule and should have been terminated. But asking the Seventh Circuit question **"whether the employer would have taken the same action had the employee been of a different race ...."** *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157,158 (7th Cir. 1996), the Appellee would have been and should have been

32

required to explain the difference in discipline not just the existence of Appellant's policy violation. The Appellant in turn has never been required and should never have been required to prove race was a part of the normal operating procedures (although it was the only differing factor in the different disciplinary procedures).

The Fourth Circuit held in *Sears,* where "there is a clear prima facie case of employment discrimination, a good deal of evidence of pretext casting serious doubt on the employer's proffered justification for its job action, and nothing to prevent a rational fact-finder from finding that the employer was motivated by discriminatory reasons," the trial court "may not" require a plaintiff to satisfy a higher burden. *Sears*, 243 F.3d at 857 (*citing Reeves*, 530 U.S. at 147; *Hinson v. Clinch County*, 231F.3d821, 832 (11th Cir. 2000)).

## 2.    ***Prima Facie* Case Flexibility**

The lower court's rigid application of the *prima facie* framework has precluded a valid claim of discrimination to advance. This rigidity is most shown in the lower court's dismissal of Appellant's claim on the grounds that Appellant failed to show the numerous comparators were similarly situated, and therefore his claim of discrimination is defeated despite the fact that all the comparators remain employees for more infractions than Appellant or more severe infractions that Appellant. And, despite the proof that the only real difference in discipline is race. The comparators

33

were IT and Warehouse workers as well as administrators and supervisors. Despite the title, the only people who were terminated for Level I or II offenses, despite the Caucasian employees committing egregious offenses and some numerous times, were African Americans. Failure of the Appellant to make the evidence fit into every frame of the framework defeats the *McDonnel Douglas'* purpose. In the *McDonnell Douglas* case, footnote thirteen of McDonnell Douglas, clearly cautions, "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from [appellant] is not necessarily applicable in every respect to differing factual situations." *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 n.13 (1973). *McDonnell Douglas* practically requires flexibility in the prima facie analysis of discrimination cases.

In *Warch v. Ohio Casualty Ins. Co.,* the Fourth Circuit discussed the "flexibility" inherent in the *prima facie* case framework established in McDonnell Douglas framework. *(citing Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 611 (4th Cir. 1999) *(holding that "the McDonnell Douglas framework should not be applied in a 'rigid, mechanized, or ritualistic' manner"); and Moore v. City of Charlotte*, 754 F.2d 1100, 1105 (4th Cir. 1985) **(recognizing that the McDonnell Douglas framework is "less useful" in the context of an alleged discriminatory disciplinary decision than in the context of an alleged discriminatory hiring decision***).

34

To further support the idea of flexibility in the *prima facie* analysis, the discussion with respect to the replacement shows that this requirement is also unnecessary as a rigid requirement to determine the existence of one's case. The requirement of proving replacement outside of protected class, is not favored in some other circuits. In *Meiri v. Dacon,* 759 F.2d 989 (2d Cir. N.Y. 1985), the United States Court of Appeals for the Second Circuit explicitly stated that requiring a appellant in a discriminatory discharge case to prove that her employer hired someone outside her protected class was inappropriate and at odds with the policies underlying Title VII. Likewise, in 2000, in *Williams v. Trader Publishing Co.,* 218 F.3d 481, 485 (5th Cir. 2000), the Fifth Circuit held that the appellant in a Title VII case did not need to show that her employer replaced her with someone outside her protected class. In this case, the appellant was a woman who alleged that her employer discharged her due to gender discrimination in violation of Title VII. The Appellee employer contended that the appellant could not establish a prima facie case because she could not prove that her employer replaced her with a member of a non-protected class. The court found that**, although replacement with a person outside the appellant's protected class is evidence of discriminatory intent, it is not essential to the establishment of a prima facie case under Title VII**. Similarly, in 1999, in

*Pivirotto* v. *Innovative Systems, Inc.,* 191 F.3d 344 (3d Cir. Pa. 1999), the United States Court of Appeals for the Third Circuit held that a appellant alleging discriminatory discharge need not prove that she was replaced by someone outside her protected class to establish a prima facie case. The court also made reference to footnote thirteen of *McDonnell Douglas,* which stated that because the facts vary in each Title VII case, the prima facie elements set out will not necessarily be applicable to every case. In addition, the court focused on the Supreme Court's explication of the purpose of the prima facie case in Title VII employment discrimination cases. One main purpose of the prima facie case, according to the Third Circuit, is "to eliminate the most obvious, lawful reasons for the Defendant's action." Requiring an appellant to show the employer replaced the appellant with someone outside the appellant's protected class, however, does not eliminate any lawful reason why the employer may have discharged the appellant. The court further stated that even if an appellant were replaced by someone within the appellant's class, this fact alone would not necessarily eliminate the possibility that the employer discriminated against the appellant. To further bolster its holding that the replacement requirement was inconsistent with Title VII, the court listed a series of circumstances in which an employer may have replaced the appellant with someone within the appellant's protected class but may have nevertheless

36

discriminated against the appellant in discharging the appellant. One such situation is when an employer sets a higher standard for employees who belong to a certain class than for those who are outside of the protected class, which is the exact circumstance in Appellant's and other African American employees of Appellee.

"The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from [appellant] is not necessarily applicable in every respect to differing factual situations." *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n.13 (1973). Therefore, in light of McDonnell Douglas' clear qualification of the applicability of the prima facie analysis, the lower court erred in its rigid analysis of Appellant's claim in light of clear probative and material evidence to support that Appellant was meeting his employer's expectations when he committed a Level I offense that he had never been issued an employee corrective action for, and that led to his termination while other similarly situated Caucasian employees company wide were not terminated for their Level I and II offenses.

## <u>CONCLUSION</u>

Sufficient evidence exists in the Record to rebut the allegedly legitimate reason for the Appellant's termination. This is a case with significant evidence of a company-wide policy of race discrimination regardless of supervisor, as the ultimate decision maker, the HR manager remained the same. The district court erred when it applied a rigid application of McDonnel Douglas and dismissing this case because the comparators were not similar enough, because Appellant had previous infractions, and because Appellant was not replaced by a person outside of his class. The district court improperly weighed evidence rather than determine the existence of material evidence. Appellant has provided ample evidence to answer the Seventh Circuit question, which should be the central inquiry to disparate discharge cases, which is "whether the employer would have taken the same action had the employee been of a different race ....". *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157,158 (7th Cir. 1996). This case should be reversed and remanded for further **proceedings.**

## **REQUEST FOR ARGUMENT**

Appellant requests oral argument.

Respectfully Submitted,

WUKELA LAW FIRM

BY:  s/ Pheobe A. Clark

PHEOBE A. CLARK
Federal Id No. 9888
Attorney for Appellant
P. O. Box 13057
Florence, SC 29504
(843) 669-5634 (T)
(843) 669 5150 (F)

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No**. 13-1434        **Caption**:  Moses D. Fulton v. DSM Nutritional Products, LLC

## CERTIFICATE OF COMPLIANCE WITH RULE 28.l(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation**: Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

    This brief complies with the   type-volume limitation of Fed. R. App. P. 28.1 (e)(2) or 32(a)(7)(B) because:

    - ✓ this brief contains _____8822_____ *[state number of]* words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

        this brief uses a monospaced typeface and contains *[state number of]* lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements**: A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10Y2 characters per inch).

    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    - ✓ this brief has been prepared in a proportionally spaced typeface using **Microsoft Office 2010** *[identify word processing program]* in **14-point Times New Roman** *[identify font size and type style]; or*

        this brief has been prepared in a monospaced typeface using _____ *[identifY word processing program]* in _____ *[identifY font size and type style].*

/s/ Pheobe A. Clark

Attorney for: Appellant

Dated: 06/11/2013

04/13/202

40

# CERTIFICATE OF SERVICE

I certify that on <u>06/11/2013</u>    the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Christopher G. Mackaronis
Brickfield, Burchette, Ritts &
Stone, PC 1025 Thomas Jefferson
Street, NW Eighth Floor, West
Tower
Washington, DC  20007

Jonathan P. Pearson
Fisher and Phillips, **LLP**
Post Office Box 11612
Columbia, SC    29211

s/ Pheobe A. Clark
—————————————————
           Signature

05/28/2013
        Date