No. 13-1435

UNITED STATES COURT OF APPEALS
for the FOURTH CIRCUIT

MOSES D. FULTON

Plaintiff-Appellant

v.

DSM NUTRITIONAL PRODUCTS, L.L.C.

Defendant-Appellee

On Appeal from the U.S. District Court for the
District of South Carolina at Florence

## BRIEF OF APPELLEE DSM NUTRITIONAL PRODUCTS, L.L.C.

Christopher G. Mackaronis
BRICKFIELD, BURCHETTE, RITTS
& STONE, PC
1025 Thomas Jefferson Street, NW
Eighth Floor, West Tower
Washington, DC 20007
(202) 342-0800 (phone)
(202) 342-0807 (fax)

Jonathan P. Pearson
FISHER AND PHILLIPS LLP
Post Office Box 11612
South Carolina 29211
(803) 255-0000 (phone)
(803) 255-0202 (fax)

*Attorneys for Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No.  13-1435          Caption:  Moses D. Fulton v. DSM Nutritional Products, LLC

Pursuant to FRAP 26.1 and Local Rule 26.1,

DSM Nutritional Products, LLC
(name of party/amicus)


who is     Appellee          , makes the following disclosure:
        (appellant/appellee/amicus)


1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☒ NO

2.    Does party/amicus have any parent corporations?                    ☒ YES ☐ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations: DSM Nutritional Products, LLC is a single member LLC of which
      DSM Pharmaceutical, Inc. is the sole member.  DSM Pharmaceutical, Inc. is owned
      by DSM Holding Company, USA, Inc. as the sole shareholder.  DSM Holding
      Company USA, Inc. is owned by DSM Finance B.V. as the sole shareholder, which is a
      wholly owned subsidiary of Koninklijke DSM N.V., which is publicly traded
      company on the European Market (a/k/a Royal DSM N.V.).

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                        ☒ YES ☐ NO
      If yes, identify all such owners:
      Wholly owned by Royal DSM N.V.

- 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES☒NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES☒NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐YES☒NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _C. G. mackarous_    Date: _7/9/13_

Counsel for: _Appellee_

## CERTIFICATE OF SERVICE
************************

I certify that on _July 9, 2013_ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_C. G. mackarous_
(signature)

_7/9/13_
(date)

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ iii

TABLE OF AUTHORITIES ................................................................................. iv

SUBJECT MATTER AND JURISDICTION ........................................................ 1

STATEMENT OF ISSUES .................................................................................... 1

STATEMENT OF THE CASE .............................................................................. 1

STATEMENT OF FACTS ..................................................................................... 5

SUMMARY OF ARGUMENT ........................................................................... 10

ARGUMENT ...................................................................................................... 11

I.     THE APPELLANT FAILED TO ESTABLISH TRIABLE ISSUES
      REGARDING HIS *PRIMA FACIE* CASE ON SUMMARY
      JUDGMENT. ................................................................................... 11

     A.    The Title VII Analytical Framework. ...................................... 12

     B.    The Appellant Was Not Meeting DSM's Legitimate
         Expectations. ............................................................................ 14

     C.    There Is No Evidence To Satisfy The Fourth Element
         Of The Prima Facie Case ........................................................ 17

     D.    There Is No Evidence Suggesting That DSM's Legitimate
         Non-discriminatory Reason Was Pretextual ............................ 22

CONCLUSION ................................................................................................... 24

REQUEST FOR ARGUMENT ........................................................................... 25

CERTIFICATE OF COMPLIANCE ................................................................... 26

CERTIFICATE OF SERVICE ............................................................................ 27

## TABLE OF AUTHORITIES

**Cases**

*Barber v. Hosp. Corp. of Am.*, 977 F.2d 872 (4th Cir. 1992) .................................. 13

*Blair v. Colonnas Shipyard, Inc.*, 52 F. Supp. 2d 687, 694 (E.D. Va. 1999),
    *aff'd mem.,* 203 F.3d 819 (4th Cir. 2000).................................................. 18

*Brinkley v. Harbour Recreation Club*, 180 F.3d 598 (4th Cir. 1999).............. 14, 15

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................... 12

*Gaither v. Wake Forest Univ.*, 129 F. Supp. 2d 863 (M.D.N.C. 2000) .................. 18

*Hawkins v. Pepsico, Inc.*, 203 F.3d 274 (4th Cir. 2000) ........................................ 15

*Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277 (4th Cir. 2004)
    (en banc))........................................................................................... passim

*Holland v. Wash. Homes, Inc.*, 487 F.3d 208 (4th Cir. 2007)................................. 12

*Hoyle v. Freightliner, L.L.C.*, 650 F.3d 321 (4th Cir. 2011)............................. 20, 21

*Hughes v. Bedsole*, 48 F.3d 1376 (4th Cir. 1995) .................................................... 23

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977).............................. 26

*Karpel v. Inova Health Sys. Servs.,* 134 F.3d 1222 (4th Cir. 1998)............ 14, 18, 24

*Koski v. Standex Int'l Corp.*, 307 F.3d 672 (7th Cir. 2002)..................................... 21

*Laing v. Fed. Express Corp.*, 703 F.3d 713 (4th Cir. 2013) ........................... passim

*Lightner v. City of Wilmington*, 545 F.3d 260 (4th Cir. 2008)................................ 23

*Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742 (4th Cir. 1998)......................... 26

*Mathews v. Giant Food, Inc.*, 187 F. Supp. 2d 486 (D. Md. 2002) ........................ 18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).............. 12

*McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337 (1991)......................................... 15

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817,
36 L.Ed.2d 668 (1973) ........................................................................... 1, 3, 10, 14

*Miles v. Dell, Inc.*, 429 F.3d 480 (4th Cir. 2005) ............................................... 15, 19

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ......................... 21

*Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510 (4th Cir. 2006) ................................... 13

*White v. BFI Waste Servs., L.L.C.*, 375 F.2d 288 (4th Cir. 2004) ..................... 15, 19

**Statutes**

28 U.S.C. § 1291 (2012) .......................................................................................... 1

28 U.S.C. § 1331 (2012) .......................................................................................... 1

28 U.S.C. § 636(b)(1)(A) (2012) ............................................................................. 2

42 U.S.C. § 2000e (2012) ........................................................................................ 1

**Rules**

D.S.C. Civ. R. 73.02(B)(2)(g) .................................................................................. 2

## SUBJECT MATTER AND JURISDICTION

The Appellant's suit in the district court was filed pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (2012). Subject matter was conferred on the district court by 28 U.S.C. § 1331. Pursuant to 28 U.S.C. § 1291, this Court has appellate jurisdiction over the final judgment of the district court dated March 4, 2013.

## STATEMENT OF ISSUES

Under the burden-shifting method of proof established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), did the Appellant create a genuine dispute of material fact that (a) he was performing up to his employer's legitimate expectations, (b) similarly situated employees outside the protected class were treated more favorably, and (c) the employer's articulated reason for the challenged termination was a pretext for discrimination?

## STATEMENT OF THE CASE

This is an appeal from a district court order granting summary judgment to Appellee DSM Nutritional Products, L.L.C. ("DSM") on the Appellant's claim that he was terminated from employment based on his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (2012) ("Title VII").

- 1 -

The Appellant, Moses D. Fulton ("Fulton"), filed suit on November 29,

2011, in the Federal District Court for the District of South Carolina, Florence

Division. (Joint Appendix 8 (hereinafter "J.A.").) In his complaint, Fulton alleged

that he was treated differently on the basis of his race "[s]ince the beginning of his

employment and throughout the course of his employment" with DSM. (J.A. 9.)

Fulton alleged a "pattern and practice of discrimination on the basis of race" with

regard to "terms, privileges and conditions of employment" (J.A. 10), and with

respect to DSM's hiring process. (J.A. 10.) Fulton also alleged that his

termination was unlawfully motivated by his race. (J.A. 10.)

On August 27, 2012, following the completion of discovery, DSM moved

for summary judgment. (J.A. 4; D.E. 20.) After briefing by the parties, and

pursuant to 28 U.S.C. § 636(b)(1)(A) and D.S.C. Civ. R. 73.02(B)(2)(g), United

States Magistrate Judge Thomas E. Rogers, III, issued a Report and

Recommendation on January 18, 2013 (hereinafter "Report"). (J.A. 156.) In

addressing the Appellant's claim that his termination was motivated by his race,

and noting the absence of any direct evidence of discrimination, Magistrate Rogers

applied the "burden shifting proof scheme established in *McDonnell Douglas

Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973)." (J.A.

167-69.) As the magistrate explained, in a termination case, the plaintiff must

present facts showing that (1) he is a member of a protected class; (2) he suffered

an adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by a similarly qualified applicant outside the protected class. (J.A. 168 (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc)).) As the magistrate noted, "[t]he fourth element can also be met by showing that similarly-situated employees outside the protected class received more favorable treatment, or other circumstances giving rise to a reasonable inference of unlawful discrimination." (J.A. 168 (citations omitted).)

The magistrate found that the Appellant failed to establish two prongs of his prima facie case. First, he found that the Appellant "fails to point to sufficient evidence to meet the third requirement for a prima facie case of discrimination" (J.A. 171), namely, that he was meeting DSM's legitimate expectations at the time of his termination. Second, the magistrate found that the Appellant had failed to meet the fourth prong of the prima facie case because he failed to demonstrate that "similarly situated employees outside his protected class were treated differently for similar behavior." (J.A. 171.) Moving beyond the prima facie case, the magistrate also concluded that DSM had articulated a legitimate, non-discriminatory reason for the Appellant's termination – his excessive non-

- 3 -

conformances – and that the Appellant had failed to demonstrate that DSM's reason for his termination was a pretext for discrimination. (J.A. 174-75.)

Appellant timely filed objections to the magistrate's Report. (J.A. 6; D.E. 38.) The Appellant objected to the magistrate's findings that he had failed to create an issue of fact that (a) he was meeting DSM's legitimate expectations, and (b) similarly situated employees outside of Appellant's class had been treated differently. (J.A. 6; D.E. 38 at 4.) As the district court observed, the Appellant did not object to the magistrate's finding that the Appellant failed to show that DSM's legitimate non-discriminatory reason "was actually pretext for a discriminatory reason." (J.A. 183.)

The district court agreed with the magistrate judge that the Appellant had not created a question of fact that his performance was satisfactory. (J.A. 180-81.) The district court ruled that Appellant had failed to show that DSM's expectation about non-conformances "was not legitimate or reasonable" (J.A. 181 (citing J.A. 171)), and that because Appellant had "failed to show satisfactory job performance, his *prima facie* case fails and this Court need go no further in adopting the magistrate's recommendation that Defendant's Motion for Summary Judgment be granted" (J.A. 181.). And, like the magistrate, the district court concluded that the Appellant had not produced evidence showing that "similarly situated" employees were treated differently. (J.A.181-83.) As the district court

- 4 -

concluded, "Plaintiff has failed to present sufficient evidence to show that other
employees were similarly situated in 'all relevant respects' to satisfy the fourth
element of the *prima facie* standard." (J.A. 183.) Further, the district court noted
that the Appellant had not objected to the magistrate's finding that DSM had
produced a legitimate, non-discriminatory reason for the termination (excessive
non-conformances) which the Appellant had not shown was pretextual. (J.A. 183.)
Nevertheless, the district court reviewed and adopted the magistrate's finding with
regard to DSM's explanation for the termination. (J.A. 183.) The district court
entered summary judgment for DSM on March 4, 2013 (J.A. 185), and the
Appellant timely filed a notice of appeal (J.A. 186).

## STATEMENT OF FACTS

DSM operates a facility in Kingstree, South Carolina, where it produces
products made from microalgae. (J.A. 156.) The products are used as food and
nutritional additives. (J.A. 157.) Appellant worked in two production departments
at the Kingstree facility: "ARA Extraction" and "RBD." (J.A. 74-75.) The ARA
Extraction Department extracts Omega-3 and Omega-6 fatty acids from algae.
(J.A. 74.) After extraction, the product goes to RBD, an abbreviation for Refining,
Bleaching and Deodorizing, where the products go through the named processes
before the products are marketed. (J.A. 157.)

- 5 -

Appellant was hired by DSM on December 27, 2004, as a Manufacturing

Technician in the RBD Department under the supervision of Danny Godwin. (J.A.

72-73, 157.) Manufacturing Technicians, also known as Production Operators, are

divided into three levels – A, B, and C – based upon acquired skill levels in a

particular department. (J.A. 76, 157.) Production Operators also have different

pay levels, from one to three. To progress from Level 1 to Level 2, an Operator

must develop increased skill levels in one department. To move from pay Level 2

to pay Level 3, an Operator must develop significant skills in more than one

department. (J.A. 76, 157.) Appellant spent his first year working and training

exclusively in the RBD Department. (J.A. 78, 157.) On April 1, 2006, Appellant

was promoted from a Level 1 Manufacturing Technician to Level 2, with a

corresponding increase of $1.50 per hour in pay. (J.A. 79, 111, 157.) Under DSM

policy, Appellant had to acquire skills in another department in order to be

promoted to Level 3. (J.A. 80, 157.) Appellant's supervisor, Danny Godwin,

rotated him from the RBD Department to ARA Extraction to provide him the

training necessary for advancement to pay Level 3. (J.A. 113-14, 157.)

Subsequently, on March 1, 2009, Appellant was promoted to Level 3 when he

achieved C-Operator status in RBD and B-Operator status in ARA Extraction.

(J.A. 89-90, 121, 157-58.)

Production Operators like the Appellant are required to keep written records of production activities and data during each shift. (J.A. 86, 159.) The data can include temperatures, formulas and other items required by DSM standard operating procedures. (J.A. 86, 159.) A "non-conformance" is a production or recordkeeping error on the part of a Production Operator. (J.A. 86.) Under DSM's written policy, "[i]f an operator has three (3) or more errors in a month (per the monthly nonconformance report), the supervisor may review the mistakes with the operator and document the coaching session." (J.A. 116.) The performance objective is ten or fewer non-conformances per quarter, and "36 errors or less per year per operator." (J.A. 117, 125, 159.) DSM's form for recording a non-conformance coaching session requires the signature of both the supervisor and employee, and specifically indicates that "if there is not immediate and sustained improvement," the employee is subject to "future disciplinary action up to and including dismissal." (J.A. 116, 117.)

The Appellant's chronic problem with non-conformances resulted in his termination. (J.A. 125, 161-62.) By late 2007, the Appellant's supervisor changed from Danny Godwin to Billy Poston. (J.A. 83, 159.) The Appellant had not previously worked with Poston and testified that he had no prior problems with him. (J.A. 84, 159.) The Appellant confirmed, however, that Poston's supervisory style was different than Godwin's. (J.A. 84.) According to the Appellant, Poston

- 7 -

"stayed on top of paperwork" and kept "up with production records more
carefully" than Godwin. (J.A. 84-85, 159.) The Appellant admitted that Poston
was more careful about non-conformances than Godwin. (J.A. 86.) According to
the Appellant, Poston would be more likely to point out a non-conformance, would
have a coaching session with the employee, and would "write you up" if the non-
conformances persisted. (J.A. 87, 159-60.)

In the latter part of 2007, the Appellant received documented coaching
sessions from Poston for three non-conformances in the month of October and
seven in November. (J.A. 116-17.) The Appellant had four non-conformances in
January 2008 and received another documented coaching session from Poston.
(J.A. 119.). Despite his awareness of Poston's focus on non-conformances, the
Appellant had twenty-one (21) non-conformances in the three months immediately
preceding his 2009 appraisal. (J.A. 18, 125.) In the Appellant's 2009 Performance
Appraisal (November 2009), supervisor Poston rated the Appellant as "Needs
Improvement," and wrote that "Moses needs to review documentation during shift
and at shifts end, *to reduce his batch record non-conformances.*" (J.A. 124
(emphasis added).) The appraisal defines the "Needs Improvement" rating as
"Employee has not met most expectations/targets. May require a performance
improvement plan." (J.A. 124.) Following his appraisal, the Appellant's problems
with non-conformances persisted. By January 15, 2010, he had accumulated an

- 8 -

additional sixteen (16) non-conformances from November 1, 2009. (J.A. 18, 125.)

DSM's records indicate that the Appellant's number of non-conformances was far in excess of other employees in the same production unit. (J.A. 18.) For example, during the 2008 appraisal year (November 2007 thru October 2008), the Appellant's eighty-three (83) non-conformances was almost twice the number of the next highest Production Operator, Dusty Dorrell, who had forty-five (45). (J.A. 13, 18.) And during the 2009 appraisal year, the Appellant had fifty-five (55) non-conformances, and the next highest number was Michael Langley's thirty-two (32). (J.A. 13, 18, 162-63.) Even during his last three months of employment, the Appellant's twenty-one (21) non-conformances were more than double the number of the next highest employee on his shift. (J.A. 18, 162-63.) The Appellant acknowledged his errors (J.A. 107), and testified he understood "that if you had excessive non-conformances it could lead to disciplinary action and even termination" (J.A. 88, 162.). The Appellant's termination notice identified "Excessive Non-Conformance Errors" as the grounds for the termination. (J.A. 125.)

The termination notice also referenced previous issues that the Appellant had experienced. (J.A. 125.) In August 2006 and March 2007, the Appellant received written corrective action notices regarding attendance issues and the use of unscheduled leave. (J.A. 112, 115.) In January 2008 he received another

- 9 -

corrective action notice for early departures and unscheduled absences and was

placed on three (3) months probation. (J.A. 118.) When the Appellant's

attendance issues persisted, supervisor Poston issued another corrective action

notice in September 2009 which placed the Appellant on six months probation.

(J.A. 122.) He was on probation at the time of his termination. In addition,

Appellant received a corrective action notice in August 2008 when his failure to

follow standard operating procedure resulted in the loss of "more than 400 kg of

ARA oil . . . that could have possibly been recovered." (J.A. 120.)

## SUMMARY OF ARGUMENT

On summary judgment, the Appellant failed to create triable issues of fact

regarding his prima facie case under the burden-shifting method of proof

established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The

Appellant's excessively high level of admitted non-conformances, his "Needs

Improvement" performance evaluation, and his probationary status prevented him

from demonstrating that he was performing up to DSM's legitimate expectations.

Nor did the Appellant create a triable issue that similarly situated employees

outside the protected class were treated more leniently than he was. The frequency

of the Appellant's non-conformances was so high that he was uniquely situated

well-beyond the range of any cohorts – so much so that no other employees meet

the "similarly situated" standards of this Circuit. Indeed, the individuals to whom

- 10 -

the Appellant compares himself were not similarly situated in all relevant respects
to make any comparison meaningful. The alleged comparators worked in different
positions, with different performance standards, for different supervisors, and had
engaged in different conduct. There was no proof of bias by Billy Poston, the
Appellant's supervisor who initiated his termination.

Finally, there was no proof that DSM's articulated non-discriminatory
explanation for the challenged termination – the Appellant's chronic and excessive
non-conformances – was a pretext for discrimination. The Appellant admitted the
errors, and there was no proof on summary judgment that DSM's concern with the
accuracy of its production records was not bona fide, particularly in light of
oversight by customers and the Food and Drug Administration.

## ARGUMENT

I. THE APPELLANT FAILED TO ESTABLISH TRIABLE ISSUES
REGARDING HIS *PRIMA FACIE* CASE ON SUMMARY JUDGMENT.

The Court reviews the trial court's decision on summary judgment de novo,
applying the same standard as the district court. *Holland v. Wash. Homes, Inc.*,
487 F.3d 208, 213 (4th Cir. 2007). Summary judgment is proper if the non-
moving party fails to establish an essential element of any cause of action upon
which the non-moving party has the burden of proof. *Celotex Corp. v. Catrett*, 477
U.S. 317, 322 (1986). Once the moving party has brought into question whether
there is a genuine dispute for trial on a material element of the non-moving party's

- 11 -

claims, the non-moving party bears the burden of coming forward with specific

facts which show a genuine dispute for trial. *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574 (1986). While the facts and inferences to be drawn

therefrom must be viewed in the light most favorable to the non-moving party, the

non-moving party may not rely on beliefs, conjecture, speculation or conclusory

allegations to defeat a motion for summary judgment. *Barber v. Hosp. Corp. of*

*Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992).

A.    The Title VII Analytical Framework.

The Appellant alleges that he was terminated due to his race in violation of

Title VII. A Title VII plaintiff may establish a claim of discrimination by

demonstrating through direct or circumstantial evidence that race discrimination

motivated the employer's decision to terminate him. *See Hill*, 354 F.3d at 284.

"Direct evidence encompasses 'conduct or statements' that both (1) 'reflect

directly the alleged discriminatory attitude,' and (2) 'bear directly on the contested

employment decision.'" *Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir.

2013) (quoting *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006)).

The Appellant did not produce any direct evidence of race discrimination to the

district court. (J.A. 168, 179.) Absent direct evidence, a Title VII plaintiff may

proceed by producing circumstantial evidence under the burden-shifting

framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Laing*, 703 F.3d at 718-19.

"*McDonnell Douglas* first requires that the plaintiff establish a prima facie case of discrimination by a preponderance of the evidence." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir. 1999). To establish a prima facie case that he was terminated because of his race, the Appellant had to show: (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) at the time of the adverse employment action he was performing at a level that met DSM's legitimate job expectations, and (4) following his discharge, his position remained open to or was filled by similarly qualified applicants outside of his protected class. *Id.; see also Karpel v. Inova Health Sys. Servs.,* 134 F.3d 1222, 1228 (4th Cir. 1998). The fourth element can also be met by showing that similarly-situated employees outside the protected class received more favorable treatment or other circumstances giving rise to a reasonable inference of discrimination. (J.A. 190 (citing *White v. BFI Waste Servs., L.L.C.*, 375 F.2d 288, 295 (4th Cir. 2004); *Miles v. Dell, Inc.*, 429 F.3d 480, 486-87 (4th Cir. 2005)).)

If a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the termination. *See Brinkley*, 180 F.3d at 607. If the employer meets this burden of production, then the plaintiff must prove that the "proffered reason was mere pretext and that race

- 13 -

was the real reason for [the appellant's] termination." *Hawkins v. Pepsico, Inc.*, 203 F.3d 274, 278 (4th Cir. 2000). To avoid judgment as a matter of law on this issue, the plaintiff must establish "a legally sufficient evidentiary basis for a reasonable jury to find for" the plaintiff. *Id.* at 278-79. "[S]ummary judgment or a directed verdict is mandated where the facts and the law will reasonably support only one conclusion." *Id.* at 279 (quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356 (1991)).

B. The Appellant Was Not Meeting DSM's Legitimate Expectations.

Both the magistrate judge and the district court concluded that the Appellant failed to create a triable issue that he was meeting DSM's legitimate expectations. (J.A. 169-71, 203.) At the time of the Appellant's termination, he was on six (6) months probation for attendance violations. (J.A. 122, 169.) As the magistrate judge observed, "[t]his probationary period followed two previous corrective actions regarding his absences and one previous three-month probation for excessive absences." (J.A. 169; *see also* J.A. 112, 115, 118.) Shortly before his termination, the Appellant received an annual performance appraisal with a "Needs Improvement" rating, which meant that he "has not met most expectations/targets." (J.A. 124.) And the appraisal specifically addressed the issue that led to his termination – the Appellant's excessive non-conformances. "Moses needs to review documentation during shift and at shifts end, *to reduce his batch record*

- 14 -

*non-conformances*." (J.A. 124 (emphasis added).)  The Appellant had received

documented coaching for non-conformances twice in 2007 and once in 2008.  (J.A.

116-17, 119.)  Under DSM's written policy, "[i]f an operator has three (3) or more

errors in a month (per the monthly nonconformance report), the supervisor may

review the mistakes with the operator and document the coaching session."  (J.A.

116.)  The performance objective is ten or fewer non-conformances per quarter,

and "36 errors or less per year per operator."  (J.A. 117, 125, 159.)

   DSM's production records confirm the Appellant's chronic failure to meet

the company's non-conformance expectations.  Despite his awareness of his

supervisor's focus on non-conformances, the Appellant had twenty-one (21) non-

conformances in the three months immediately preceding his 2009 appraisal.  (J.A.

18, 125.)  And following his appraisal, the Appellant's problems with non-

conformances persisted.  By January 15, 2010, he had accumulated an additional

sixteen (16) non-conformances from November 1, 2009.  (J.A. 18, 125.)  The

Appellant's number of non-conformances was far in excess of other employees in

the production unit.  (J.A. 18.)  For example, during the 2008 appraisal year

(November 2007 through October 2008), the Appellant's eighty-three (83) non-

conformances were almost twice the number of the next highest Production

Operator, Dusty Dorrell, who had forty-five (45).  (J.A. 13, 18.)  And during the

2009 appraisal year, the Appellant had fifty-five (55) non-conformances, and the

- 15 -

next highest number was Michael Langley's thirty-two (32). (J.A. 13, 18, 162-63.)

Even during his last three months of employment, the Appellant's twenty-one (21)

non-conformances were more than double the number of the next highest

employee on his shift. (J.A. 18, 162-63.) By any measure, the Appellant failed

over a prolonged period of time to meet DSM's legitimate expectations. *See*

*Karpel*, 134 F.3d at 1228 (holding that a plaintiff who "was repeatedly tardy, had

multiple inadequate medpasses, and failed to submit any of her required monthly

summaries" failed to show satisfactory performance); *Mathews v. Giant Food,*

*Inc.*, 187 F. Supp. 2d 486, 489 (D. Md. 2002) (holding plaintiff's violation of

company policy demonstrates unsatisfactory performance); *Gaither v. Wake Forest*

*Univ.*, 129 F. Supp. 2d 863, 867 (M.D.N.C. 2000) (same); *Blair v. Colonnas*

*Shipyard, Inc.*, 52 F. Supp. 2d 687, 694 (E.D. Va. 1999), *aff'd mem.,* 203 F.3d 819

(4th Cir. 2000) ("[S]ince [employee] violated policies that the [employer]

considered 'very important,' he did not perform his job satisfactorily and cannot

establish a prima facie case of race discrimination."). Appellant acknowledged his

errors (J.A. 107), and testified he understood "that if you had excessive non-

conformances it could lead to disciplinary action and even termination" (J.A. 88,

162).

C.    There Is No Evidence To Satisfy The
      Fourth Element Of The Prima Facie Case.

On summary judgment, the Appellant could satisfy the fourth element of his

prima facie case by showing that similarly-situated employees outside the

protected class received more favorable treatment, or other circumstances giving

rise to a reasonable inference of discrimination. (J.A. 168 (citing *White*, 375 F.2d

at 295; *Miles*, 429 F.3d at 486-87).) Satisfaction of the fourth element is necessary

to show that "the relevant decisionmaker at [DSM] harbored . . . a discriminatory

motivation." *Hill*, 354 F.3d at 298. It is undisputed that the Appellant's

termination was initiated by his supervisor, Billy Poston. And there was no

summary judgment evidence from which a discriminatory motive can be attributed

to Poston.

First, there are no similarly situated employees who were treated more

leniently by Poston or by anyone else, for that matter. Although the Appellant

argued to the magistrate judge that non-minority employees "had the same or

worse records of non-conformance without being terminated" (J.A. 162), he

submitted no proof to support his claim, which is controverted by the DSM non-

conformance records (J.A. 18). For the two years preceding his termination, the

Appellant's non-conformances were far in excess of allowable limits, and

substantially greater than any other employee in the production unit. (J.A. 13-14,

18, 125, 169.) The Appellant's failure to identify any employee with a similar

- 17 -

record of non-conformances justified the entry of summary judgment by the
district court. *Laing*, 703 F.3d at 713 (holding that there are no similarly situated
employees in the absence of proof of other employees who violated the same
company policy); *Hoyle v. Freightliner, L.L.C.*, 650 F.3d 321, 337 (4th Cir. 2011)
(affirming district court holding that plaintiff failed to prove her prima facie case
"because she has not identified any similarly situated employees who were treated
more favorably while on a last chance agreement.").

Notwithstanding his unprecedented level of non-conformances, Appellant
argues on appeal that the district court erred in finding that his alleged comparators
were "similarly situated in few, if any, relevant respects." (Appellant's Br. at 24-
25 (quoting J.A. 171).) But, as the district court observed, the Appellant's
"comparators" worked in different jobs and engaged in different conduct from the
Appellant. (J.A. 171-73.) Even more importantly, the Appellant's "comparators"
do not create an inference of discrimination because none of them pertain to
supervisor Poston. In order to demonstrate an intent to discriminate, the plaintiff
"must produce sufficient evidence upon which one could find that 'the protected
trait . . . actually motivated the employer's decision.'" *Hill*, 354 F.3d at 286
(quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141(2000)).
For this reason, the pertinent inquiry is "whether the decisionmaker, as opposed to
other managers or subordinates, evaluated the aggrieved employee based upon

- 18 -

discriminatory criteria." *Hill*, 354 F.3d at 286 (citing *Koski v. Standex Int'l Corp.*, 307 F.3d 672, 678 (7th Cir. 2002)). Because the examples cited by the Appellant do not relate to Poston's motivation – one way or another – they are not evidence that his reliance on the Appellant's excessive non-conformances is a pretext for racial discrimination. And the holdings in *Laing* and *Hoyle* suggest that the Appellant's failure to identify anyone else with a comparable record of non-conformances also precludes him from establishing a prima facie case because there are no examples of comparable conduct. *See Laing*, 703 F.3d at 713; *Hoyle*, 650 F.3d at 337.

With no proof regarding a similar history of non-conformances, or the same supervisor, Appellant argues that DSM's varying treatment of employees who committed "Level I and Level II" offenses gives rise to an inference of discrimination. (Appellant's Br. 9-10.) The plaintiff's argument is premised on a portion of DSM's Employee Handbook addressing employee discipline. (J.A. 136-37.) The Handbook identifies Level I and Level II offenses. Level II offenses are introduced with the following language:

> Level II offenses *may warrant an employee's termination. Although each case will be considered in light of its particular background and circumstances,* the following are examples of Level II offenses (this list is not all-inclusive) . . . ."

(J.A. 159 (emphasis added).) The Appellant claims that he "was terminated for what was considered a Level I offense, non-conformance errors." (Appellant's Br.

- 19 -

9.) He then argues, in effect, that employees guilty of both Level I and Level II

offenses must be treated identically, and the failure to do so gives rise to an

inference of discrimination. (Appellant's Br. 10.) Appellant's argument is flawed.

Factually, there is no basis for Appellant's argument that he was "terminated

for what was considered a Level I offense" (presumably "Poor work effort").

(Appellant's Br. 9.) The Appellant was terminated for his sustained unacceptable

performance. His chronic, excessive non-conformances were undisputed proof on

summary judgment that he failed to meet DSM's legitimate expectations.

Generically, the offenses listed in the DSM handbook under Levels I and II are

"other than" performance grounds for possible employee discipline. Indeed, the

Appellant's claim that his unacceptable performance was a Level I offense is

illogical, because unacceptable performance is universally recognized as a

legitimate basis for termination of employment. Even the Appellant admitted this.

(J.A. 88, 162 (admitting that excessive non-conformances could lead to

termination).)[1]

Legally, the Appellant's argument fails for two independent reasons. In

order to raise an inference of discrimination, "[t]he similarity between comparators

---

[1]    The Handbook does not *require* termination for a Level II offense (J.A. 136
("*may warrant* an employee's termination")) and expressly indicates that "each
case will be considered in light of its particular background and circumstances"
(J.A. 136). As with most employers, DSM has reserved the right to approach
serious disciplinary issues on a case-by-case basis.

- 20 -

and the seriousness of their respective offenses must be clearly established in order to be meaningful." *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008). The factual circumstances of the comparators must be "substantially similar." *Hughes v. Bedsole*, 48 F.3d 1376, 1385 (4th Cir. 1995). The plaintiff would have the Court ignore this threshold factual requirement and hold, as a matter of law, that the entire range of offenses described in the DSM Handbook are "substantially similar." The law in this Circuit is precisely to the contrary. Moreover, in comparing himself with other employees who committed dissimilar offenses, Appellant ignores both his disciplinary record as well as the sub-par evaluation received shortly before his termination, all of which further demonstrate that he was not "similarly situated" to any of the employees to which he attempts comparison. *See Karpel*, 134 F.3d at 1228 ("Karpel presents no evidence showing that any other employee had nearly the same problems as she did across the board.").

Even presuming that the Appellant's unacceptable performance is an "offense" under the Handbook, his claim that offenses on the same levels should be treated identically would render meaningless "the most salient aspects of [the *McDonnell Douglas*] framework – comparator evidence . . . ." *Laing*, 703 F.2d at 719. Appellant's argument would lump together employees in different jobs, working for different managers, complying with different performance standards,

- 21 -

and guilty of disparate offenses. No meaningful inferences could possibly be

drawn regarding Billy Poston's motivation from such a diverse group of

employees.

Finally, the Appellant's effort to change the spotlight from Poston to the

human resource department is unavailing. (Appellant's Br. 29 (alleging "HR's

discriminatory attitude"). It is undisputed that Poston initiated the termination, so

it is his motivation that matters for a Title VII analysis. Review of a termination

by human resources is standard practice for an employer with hundreds of

employees, as is the case here. (J.A. 42 (HR review for consistency with

Employee Handbook and fairness).) *See Hill*, 354 F.3d at 290 (holding that the

focus is on the individual "principally responsible for the contested employment

decision").

> D.    There Is No Evidence Suggesting That DSM's
>        Legitimate Non-discriminatory Reason Was Pretextual.

As the district court noted, the magistrate judge found that the Appellant's

"repeated, excessive non-conformances" constituted a legitimate non-

discriminatory reason for his termination which the Appellant failed to show was a

pretext for discrimination. (J.A. 183.) The Appellant did not object to this finding.

(J.A. 183.) Nevertheless, the Appellant argues now on appeal that his proof of a

pattern of discrimination at DSM was sufficient to create a triable issue about

pretext (Appellant's Br. 32 (alleging DSM "engaged in a pattern of (sic) practice of

discrimination").) But the Appellant has no proof of isolated incidents of race discrimination, much less a pattern. (J.A. 175.)

In order to prove a "pattern and practice" of discrimination, the plaintiff must "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977). Instead, the plaintiff must "establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure – the regular rather than the unusual practice." *Id.* Although in some cases a Title VII plaintiff may "be able to use statistical evidence of a pattern or practice of discrimination to help establish pretext, this is not such a case." *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 764 (4th Cir. 1998).

The Appellant's allegation of a pattern and practice of race discrimination by DSM is unavailing for multiple reasons. First, he has no statistics — much less relevant and admissible statistical evidence — of workplace disparities based on race. For example, although contesting his termination, the Appellant has not supplied any proof suggesting that DSM terminates minority employees at greater rates than others for the same offenses. Indeed, the "anecdotes" the plaintiff cites in support of his alleged "pattern and practice" have nothing at all to do with terminations. Because none of the anecdotes involved the same supervisor or the same misconduct, they have no relevance to the Appellant's termination. (*See,*

- 23 -

*e.g.*, Appellant's Br. 14-15 (Nicki Lee, different supervisor, different position and

different conduct (J.A. 182); Joe Weatherford, different position, different

supervisor, different conduct (J.A. 182); Gerald Timmons, different position,

different supervisor, different conduct (J.A. 182); Mathew Evans, different conduct

(J.A. 182); Sparky Avant, different conduct (J.A. 182); Brian Lowder, different

department, different supervisor, different conduct (J.A. 182); and C.R. Altman,

different position and different conduct (J.A. 182)).)

## **CONCLUSION**

For the foregoing reasons, Appellee DSM respectfully requests that the

Court affirm the judgment of the district court which entered summary judgment in

favor of DSM and against the Appellant, Moses D. Fulton.

- 24 -

## REQUEST FOR ARGUMENT

Appellee DSM respectfully requests the opportunity to present oral argument to the Court.

Respectfully Submitted,

<u>//s//Christopher G. Mackaronis</u>
Christopher G. Mackaronis
BRICKFIELD, BURCHETTE, RITTS
& STONE, PC
1025 Thomas Jefferson Street, NW
Eighth Floor, West Tower
Washington, DC 20007
(202) 342-0800 (phone)
(202) 342-0807 (fax)

Jonathan P. Pearson
FISHER AND PHILLIPS LLP
Post Office Box 11612
South Carolina 29211
(803) 255-0000 (phone)
(803) 255-0202 (fax)

*Attorneys for Appellee*

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. _13-1435_    Caption: _Moses D. Fulton v. DSM Nutritional Products, LLC_

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the  type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [XX]  this brief contains ___5,319___ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ]  this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [XX]  this brief has been prepared in a proportionally spaced typeface using
   _Microsoft Word, 2007___ [*identify word processing program*] in
   _Times New Roman, 14 PT_ [*identify font size and type style*]; **or**

   [ ]  this brief has been prepared in a monospaced typeface using
   _____ [*identify word processing program*] in
   _____ [*identify font size and type style*].

(s) _C. O. Mackaronis_

Attorney for _Appellee_

Dated: _7/9/13_

# CERTIFICATE OF SERVICE

I certify that on ___7 /9/ 13___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Ms. Pheobe A. Clark
Wukela Law Firm
403 Second Loop Road
P.O. Box 13057
Florence, SC 29504-3057

Counsel for Appellant

_____
Signature

___7/9/2013___
Date